UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| YVONNE TAYLOR, and SOUTH DAKOTA MUNICIPAL LEAGUE, | 3:19-CV-03003-RAL |
| Plaintiffs, | |
| | OPINION AND ORDER GRANTING TEMPORARY RESTRAINING ORDER |
| vs. | |
| STEVEN HAUGAARD, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE HOUSE, | |
| Defendant. | |

In a complaint and motion papers filed January 22, 2019, Plaintiffs Yvonne Taylor and the South Dakota Municipal League (the League) claim that Defendant Steven Haugaard, the speaker of the South Dakota House of Representatives, violated their constitutional rights by banning Taylor—a long time lobbyist and executive director of the League—from the floor of the South Dakota House of Representatives (House Floor) because of an article she published in May 2018. Doc. 1. The Plaintiffs moved for a preliminary injunction requiring Speaker Haugaard to allow Taylor on the House Floor during the hours it is open to the public. Doc. 3. Haugaard through the South Dakota Attorney General's office admitted service of the complaint and motion papers. Doc. 6. Because of the time-sensitive nature of the case, this Court coordinated with the parties' counsel to set a hearing on the motion for January 24, 2019. Shortly before the hearing was to occur, counsel advised that the case was getting settled, but nothing more has been filed since. Because Plaintiffs' filings meet the standard for issuance of a temporary restraining order

1

(TRO), and present a case for entry of a preliminary injunction, this Court enters a TRO at this time to avert immediate and irreparable injury to Plaintiffs while settlement discussions occur.

## I.    Facts[1]

Taylor is the executive director of the League, a non-profit organized to represent South Dakota's incorporated municipalities. Doc. 1 at ¶ 7; Doc. 4 at ¶ 1. She is also a long-time lobbyist, having been registered to lobby on the League's behalf since 1997. Doc. 1 at ¶ 2. Taylor writes a column for the monthly newsletter the League sends to its members. Doc. 4 at ¶ 6. In the May 2018 newsletter, she published a column urging readers to register to vote in the June 5, 2018 primary and again in the November election. Doc. 4-1. The column drew a distinction between legislators who were "the Normal"—described as "willing to look at issues one by one, listen to facts, and make rational decisions"—and "the Wackies"—described as "opposed to government in general and all forms of taxation," believing "state and local governments are ripping them off," and thinking "facts they don't like are lies." Doc. 4-1. Taylor wrote about unopposed legislation that had died in the South Dakota House of Representatives because of the "Wackies" and how "[w]e desperately need to get that 'wacky ratio' down [and get] good quality people to serve." Doc. 4-1.

According to Taylor's affidavit, Speaker Haugaard on Monday, January 14, 2019, called Taylor into his office, asked her to close the door, and for the first time spoke with her about her May column. Doc. 4 at 2. As Taylor's affidavit tells it, Haugaard said that Taylor's column made the Legislature look like "a bunch of buffoons" and that, while Taylor was entitled to privately

---

[1]This Court takes the facts from the complaint and Taylor's affidavit and is not making any findings of fact at this time. Indeed, this Court had expected to learn what, if any, facts are in dispute during the hearing it had scheduled for January 24 and conduct an evidentiary hearing on any disputed facts at that time.

think those thoughts, she could not publish them. Doc. 4 at 2. Haugaard then asked Taylor not to be on the House Floor when open to the public until further notice. Doc. 4 at 2.

On January 16, 2019, Taylor had a letter delivered to Speaker Haugaard on the League's stationary recounting their conversation and the directive that Taylor not be on the House Floor until further notice. Doc. 4-2. Taylor protested the directive, asserting that she found no authority by statute or otherwise to ban her from the House Floor and to disrupt her work as a lobbyist in that manner. Doc. 4-2. Taylor asked for Haugaard to provide in writing his authority for banning her by end of day or she would resume her duties including being on the House Floor when it is open to the public. Doc. 4-2.

Speaker Haugaard did not respond to Taylor's letter. Doc. 4-2. The next day, on January 17, 2019, Taylor sought to enter the House Floor when it was open to the public, but the assistant sergeant at arms intervened, saying that he had been instructed by the Speaker not to let her on the House Floor and handing her a section of Mason's Rules concerning "Public Order" in legislative bodies. Doc. 4 at 2; Doc. 4-3.

Most South Dakota legislators lack offices, so their desks on the floor of the senate or house is where legislators can be found and conduct meetings. Lobbyists, when the floor is open to the public, meet with legislators on the floor and circulate sign-up sheets to sponsor bills there. The deadline this year for getting bill draft requests with completed sign-up sheets to the Legislative Research Council (LRC) is Monday, January 28, 2019. Doc. 4 at 2. The legislative session in South Dakota is short, under 40 days in length. Doc. 4 at 2. Taylor's banishment from the House Floor impedes her ability to lobby for the League and for her other interest group, the South Dakota Police Chiefs' Association. Doc. 4 at 2; Doc. 4-2.

## II.    Legislative Immunity

3

The initial question here is whether legislative immunity protects Speaker Haugaard from being sued. Absolute legislative immunity shields state legislators from certain suits for damages and injunctive relief. Supreme Court of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 732–33 (1980); Church v. Missouri, No. 17-2857, 2019 WL 149484, at *10–12 (8th Cir. Jan. 10, 2019). The purpose of legislative immunity "is to insure that the legislative function may be performed independently without fear of outside interference." Consumers Union, 446 U.S. at 731. This immunity only applies, however, if the act in question was undertaken "in the sphere of legitimate legislative activity." Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998); see also Young v. Mercer Cty. Comm'n, 849 F.3d 728, 733 (8th Cir. 2017); Leaphart v. Williamson, 705 F.3d 310, 313 (8th Cir. 2013). Determining whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." Bogan, 523 U.S. at 54. The question, then, is "whether, stripped of all considerations of intent and motive, the actions were legislative." Id. at 55. Haugaard bears the burden of showing that legislative immunity applies to his actions. Canary v. Osborn, 211 F.3d 324, 328 (6th Cir. 2000).

Drawing the line between legislative and non-legislative activity sometimes is difficult. The Eighth Circuit recently explained that the "act must be legislative 'in substance,' bearing 'all the hallmarks of traditional legislation,' and 'in form,' involving 'integral steps in the legislative process.'" Church, 2019 WL 149484, at *9 (quoting Bogan, 523 U.S. at 55). "The hallmarks of traditional legislation include the use of discretion, the making of policy that implicates budgetary priorities and the provisions of services, and prospective implications that reach beyond the particular persons immediately impacted." Schmidt v. Contra Costa Cty., 693 F.3d 1122, 1137 (9th Cir. 2012). That is, legislative acts "typically involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population." Kensington

Volunteer Fire Dep't, Inc. v. Montgomery Cty., 684 F.3d 462, 470–71 (4th Cir. 2012) (citation omitted). "To determine whether an act is legislative in form, courts look at whether the defendants acted pursuant to constitutional or statutory procedures." Bagley v. Blagojevich, 646 F.3d 378, 392 (7th Cir. 2011).

Haugaard's decision to ban Taylor from the House Floor was not "within the sphere of legitimate legislative activity." In contrast to "traditional legislation," the ban was not a general policy that affected the larger population. Nor was it a decision with prospective implications reaching beyond Taylor. Instead, the ban was an ad hoc decision that applied to and affected only Taylor. Moreover, nothing in the record suggests that the ban involved the "integral steps in the legislative process." There is no indication that Haugaard was following South Dakota's legislative procedures when he banned Taylor, and the ban was not related to any legislation or legislative function. In short, Speaker Haugaard's ban of Taylor was not legislative in either form or substance.

This decision is consistent with cases that appear to have analogous facts. In Kamplain v. Curry County Board of Commissioners, 159 F.3d 1248 (10th Cir. 1998), for instance, a board of county commissioners voted to ban the plaintiff from commission meetings after the plaintiff protested the board's decision to award a contract to a competing bidder. Id. at 1250. The board later decided that the plaintiff could attend its meetings but could not speak at or participate in them. Id. The Tenth Circuit held that these acts were not legislative because "the circumstances of [the] case did not concern the enactment or promulgation of public policy" and therefore were not "related to any legislation or legislative function." Id. at 1252. Similarly, the district court in Seum v. Osborne, No. 3:17-cv-00069-GFTV, 2018 WL 4691332 (E.D. Ky. Sept. 28, 2018), held that legislative immunity did not apply to a decision to ban the plaintiff from an area of the capitol

building because of offensive comments he made. Id. at *6. The district court reasoned that the ban was not legislative in nature because it was an ad hoc decision that only affected the plaintiff and did not bear the hallmarks of traditional legislation. Id. As in Kamplain and Seum, legislative immunity does not apply to Haugaard's decision to ban Taylor from the House Floor.

## III.    Discussion

Plaintiffs filed a motion for a preliminary injunction under Federal Rule of Civil Procedure 65(a), supported by an affidavit and memorandum of law. When addressing a motion for preliminary injunction, this Court considers the factors set forth in Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc): "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 113; see also Perfetti Van Melle USA, Inc. v. Midwest Processing, LLC, 135 F. Supp. 3d 1015, 1019 (D.S.D. 2015) (applying Dataphase factors when considering a request for a preliminary injunction). This Court intended to have a hearing on the motion for preliminary injunction on January 24, and Speaker Haugaard had notice of the hearing with counsel having noticed an appearance. Doc. 7. A preliminary injunction can issue "only on notice to the adverse party," Fed. R. Civ. P. 65(a), and this Court will not consider entry of a preliminary injunction or make any findings of fact until hearing from both parties.

Rule 65(b) meanwhile allows this Court to issue a TRO without notice if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant certifies in writing any efforts made to give notice . . . ." Fed. R. Civ. P. 65(b). "A temporary restraining order under Rule 65(b) is to prevent immediate and irreparable harm and

typically to preserve the status quo until the Court can hear from both sides." Institute for Free Speech v. Jackley, 340 F. Supp. 3d 853, 858 (D.S.D. 2018). Plaintiffs filed an affidavit averring immediate and irreparable injury under Rule 65(b)(1)(A). Haugaard has received notice of this suit and all filings, with an admission of service having been filed. Docs. 6, 7. Thus, there is certification in writing of actual service under Rule 65(b)(1)(B). Doc. 6. When a defendant receives actual notice of injunctive relief sought, the district court may consider both standards governing TRO motions and preliminary injunction motions in deciding what, if any, injunctive relief to grant. Crow Creek Sioux Tribal Farms, Inc. v. U.S. Internal Revenue Serv., 684 F. Supp. 2d 1152, 1156 (D.S.D. 2010); Saint v. Neb. Sch. Activities Ass'n, 684 F. Supp. 626, 627 n.1 (D. Neb. 1998). This Court will look to the more detailed Dataphase factors in making a preliminary evaluation of what, if any, injunctive relief should enter while the parties are working toward a settlement.

### a) Irreparable Harm

The first Dataphase factor concerns the threat of irreparable harm to Taylor. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2010). As the Supreme Court recognized many years ago, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Taylor's affidavit makes clear that the ban is harming her ability to lobby, an activity that is generally protected by the First Amendment. Brinkman v. Budish, 692 F. Supp. 2d 855, 861 (S.D. Ohio 2010). The South Dakota legislative session is quite short and a deadline for submission to the LRC of sponsor lists on draft

legislation is fast approaching. The harm appears to be immediate and irreparable under Rule 65(b)(1)(A) and under the first Dataphase factor.

### b) Balance of the Harms

The balance of the harms appears to favor Plaintiffs. As the Supreme Court of the United States long ago recognized, "the loss of First Amendment freedoms, for even minimal amounts of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 373. The harm suffered by Plaintiffs thus is irreparable and significant. Meanwhile, there appears to be little harm to Speaker Haugaard in allowing Taylor access to the House Floor alongside other lobbyists and the public, as she has done for decades as a lobbyist and executive director for the League. Haugaard appears to have no legitimate interest (if it was his intention to do so, which the Court does not know) to punish journalists or lobbyists for columns he deems to make legislators appear like buffoons. There appears to be little harm to Haugaard's legitimate interests to allow Taylor access like other lobbyists and the public have to the House Floor.

### c) Probability of Success on the Merits

The third Dataphase factor focuses on the probability that the movant will succeed on the merits. Haugaard's banning Taylor from the House Floor appears not to have been "government action based on presumptively reasoned democratic processes." Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). Thus, Taylor need only show that she has a "fair chance of prevailing" on the merits. Id. A "fair chance of prevailing" does not necessarily mean a greater than fifty percent likelihood of prevailing on the merits of the claim. Id. at 731–32.

Taylor is suing Speaker Haugaard under § 1983, which provides a cause of action against any "person" who, acting "under color of" state law, deprives another of "rights, privileges, or

8

immunities secured by the Constitution" or granted by federal statute. 42 U.S.C. § 1983. Taylor argues that the ban violates the First Amendment because it is a content-based restriction on free speech and because Haugaard imposed the ban to retaliate for Taylor writing the article. This Court focuses on the retaliation claim for purposes of the motion for a preliminary injunction.

The First Amendment generally bars government officials from retaliating against an individual for exercising her right to free speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, Taylor must show: (1) that she engaged in activity protected by the First Amendment; (2) that the Haugaard took adverse action against her that would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by Taylor's protected activity. Bennie v. Munn, 822 F.3d 392, 397 (8th Cir. 2016); Greenman v. Jessen, 787 F.3d 882, 891 (8th Cir. 2015); see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

As to the first element, the First Amendment protects the criticism of public officials as well as the publication of articles on political matters. 281 Care Comm. v. Arneson, 766 F.3d 774, 784 (8th Cir. 2014) ("Political speech is the primary object of First Amendment protection and the lifeblood of a self-governing people.") (citation omitted); Williams v. City of Carl Junction, 480 F.3d 871, 874 (8th Cir. 2007) ("The criticism of public officials lies at the heart of speech protected by the First Amendment . . . ."). Here, Taylor wrote and published an article encouraging people to vote and criticizing some members of the South Dakota legislature. The First Amendment protects this activity, so it appears that Taylor can satisfy the first element of her retaliation claim.

The second element requires this Court to determine whether Speaker Haugaard banning Taylor from the House Floor would deter a person of ordinary firmness from continuing to engage in political speech. This element is objective: "the question is not whether the plaintiff [herself]

was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." Scheffler v. Molin, 743 F.3d 619, 621 (8th Cir. 2014) (cleaned up). When applying the ordinary firmness test, courts should be "mindful" that the "effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) (citation omitted). Taylor contends that access to the House Floor is an important part of her job; it allows her to speak with several legislators at once, circulate bill sponsor sign-up sheets, and advocate for or against legislation. Doc. 4 at ¶¶ 11–18. As Taylor tells it, Haugaard banning her from the House Floor prevents her from representing the League in an effective manner. Doc. 4 at ¶ 11. An ordinary lobbyist would be deterred from engaging in protected conduct if, as a result, a public official significantly limited her ability to perform her job. See Dickinson Leisure Indus., Inc. v. City of Dickinson, 329 F. Supp. 2d 835, 847 (S.D. Tex. 2004) ("It seems obvious that if a municipality were to use its police power to purposefully undermine a citizen's livelihood, a citizen of ordinary firmness would think twice about exercising his or her right to oppose the municipality on a matter of public debate."). Taylor's affidavit and the attachments thereto suggest that Taylor has a fair chance of meeting the second element of the retaliation test.

The third element requires Taylor to show a causal connection between the ban and the article. According to Taylor's affidavit, Haugaard called her into his office, told her that she could not publish the thoughts she expressed in the article, and directed her not to be on the House Floor when it was open to the public until further notice. Doc. 4 at ¶ 8. The assistant sergeant of arms then denied Taylor access to the House Floor a few days later, explaining that Haugaard had instructed him to do so. Doc. 4 at ¶ 10. There appears to be a fair probability that Taylor can show

the requisite causal connection between the ban and her article. Because the record suggests that Taylor has a fair chance of prevailing on the merits of her First Amendment retaliation claim, the third Dataphase factor appears to favor granting the motion for a preliminary injunction.

### d) Public Interest

The public interest favors access by the public to legislators, including access to legislators by Taylor as executive director and lobbyist for the League and as lobbyist for the South Dakota Police Chiefs' Association. The public interest disfavors elected officials retaliating against journalists or columnists who write articles encouraging people to vote and criticizing closed-minded legislators. This Court hopes that Haugaard was not doing that and had some other thought in mind. This Court of course does not know that Haugaard in fact retaliated against Taylor for the column she wrote, but Taylor's affidavit and attachments to that affidavit presents a prima facie case of this. The public interest appears to strongly favor injunctive relief here.

Therefore, it is

ORDERED that a temporary restraining order enters under Federal Rule of Civil Procedure 65(b)(2) enjoining Haugaard from debarring, banishing, or restricting access by Taylor to members of the South Dakota House of Representatives or the House Floor during those times when the House Floor is open to the public and/or lobbyists. It is further

ORDERED that this temporary restraining order expires at the earliest of 14 days from its issuance or the issuance by this Court of an order dissolving or modifying the order under Rule 65(b)(4). It is further

ORDERED that the parties promptly notify this Court if any settlement or resolution is reached, the terms of that resolution, and, if they so choose, the terms of any preliminary or permanent injunction to enter.

Dated at __2:25__ p.m., this 25th day of January, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE